UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CUONG QUOC TRAN, AL3711,<br>Petitioner,<br>v.<br>JOSIE GASTELO, Warden,<br>Respondent. | Case No. 18-cv-00626-CRB (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Petitioner Cuong Quoc Tran, a state prisoner incarcerated at the California Men's Colony in San Luis Obispo, seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a conviction and sentence from Santa Clara County Superior Court. Per order filed on March 22, 2018, this Court (Cousins, M.J.) found that the petition states cognizable claims for relief under § 2254, when liberally construed, and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer to the order to show cause, but Petitioner did not file a traverse.

## BACKGROUND

A.   <u>Statement of the Case</u>

On October 11, 2011, the Santa Clara County District Attorney charged Petitioner Cuong Tran with conspiracy to commit murder. Petitioner's brother Kevin Tran was also charged with conspiracy to commit murder, as well as with kidnaping for ransom and false imprisonment with various gun-use enhancements.

On November 1, 2011, the jury found the two co-defendants guilty as charged.

On April 24, 2012, Petitioner was sentenced to 25-years-to-life for conspiracy to commit murder, and on October 22, 2012, Petitioner's brother Kevin Tran was sentenced to life with the possibility of parole for kidnaping for ransom, plus 20 years consecutive for a firearm

enhancement; 25-years-to-life for conspiracy to commit murder, to be served consecutively; and a two-year mid-term for false imprisonment, to be served concurrently.

On August 5, 2016, the California Court of Appeal affirmed the judgments of the trial court and, on November 9, 2016, the Supreme Court of California denied Petitioner's application for review.

On January 29, 2018, Petitioner filed the instant federal habeas petition.

B. Statement of the Facts

The California Court of Appeal summarized the facts of the case as follows:

> **A. THE PROSECUTION'S CASE**
> **1. Kidnapping**
> Peter Lam testified to receiving a phone call from Kevin at 5:00 a.m. on Sunday, January 9, 2011. Lam had spent Saturday evening with his friend Vu and had not slept, having played video games after returning home. Kevin was upset and wanted to speak with Lam because Vu was Kevin's girlfriend, and he suspected she and Lam were having a sexual relationship. Lam reluctantly agreed to meet Kevin at Vu's San Jose home. Kevin told Lam not to tell anyone where he was going or involve the police.
> Kevin and Lam talked in Lam's car outside Vu's home. Kevin asked Lam to describe his relationship with Vu. He grabbed Lam's phone to read his text messages. Lam told Kevin he and Vu had met in class and were just friends.
> Kevin had Lam knock on Vu's door. When she answered, Lam stepped back and she and Kevin spoke briefly. Kevin told Lam that everything was okay, and he asked Lam for a ride home. After some persistence on Kevin's part, Lam agreed. Once in Lam's car, Kevin insisted that Lam "in good faith" show him where he lived. To appease Kevin, Lam reluctantly agreed. But when Lam exited the freeway near his house, he turned around. All the while Kevin was calling Vu using Lam's phone. Suddenly, Kevin wielded a handgun, held it to Lam's head, and told him to drive to Highway 152. Kevin said "To show you I'm not fucking around," and he fired the gun into the back seat.
> Kevin told Lam he should not have meddled in his relationship with Vu, and he gave Lam three options: (1) They were going to Los Angeles where Kevin was going to kill Lam; (2) if Lam struggled, Kevin would kill him immediately, and if the police were involved Lam's family also would be killed; or (3) if Lam cooperated, Kevin might spare his life in Los Angeles but take everything Lam owned, including his car. Scared for his life and his family, and saddled with a broken leg from a recent injury, Lam decided to cooperate.
> Kevin took apart Lam's cell phone and threw it in pieces from the car window. During their drive to Los Angeles, Kevin repeated the three options and periodically pulled out his gun. Kevin told Lam he should have stayed away from Vu, and said this could be avoided if Lam would give him $10,000 cash within the next couple of hours. Lam told Kevin that was not possible.
> They arrived in Orange County where Kevin checked his computer

2

and asked Lam about a text message from Vu. But Lam had no way to retrieve his messages because Kevin had discarded Lam's phone. Before calling Vu from a payphone, Kevin told Lam that he would live or die depending on what she said. After speaking with Vu, Kevin told Lam that he was going to his gravesite. Kevin told Lam to drive to the desert, asking whether he preferred a fast or slow death. Kevin told Lam he would spare his life if Lam would kill Vu and her family. Lam refused. Lam offered to give Kevin more money within a less-stringent timeframe, but Kevin refused.

Kevin directed Lam to a dirt road off a remote exit near Bakersfield where Lam thought Kevin would kill him. Instead, Kevin had Lam make a U-turn and return to the freeway. They headed back to San Jose, but Kevin warned Lam that he was not done with him. They arrived at Vu's around 10:00 p.m. and switched to Kevin's car. Kevin started driving and Lam closed his eyes. Kevin pressed Lam about Vu. Lam insisted they were just friends, causing Kevin to punch Lam's face with a gun in his hand and hold the gun to his neck.

Kevin told Lam he would spare his life for $15,000 and his car. Kevin drove to an ATM, but Lam told him they should wait until morning when the bank opened because he could not withdraw enough money from the ATM. He told Kevin he needed to call his sister for some of the money. Lam called his sister from a pay phone, told her he needed about $5,000, he would call her back, and not to call the police. Kevin drove to a golf course and told Lam that is where he would kill him and dispose of his body if he did not get the money. After Lam called his sister a second time, she called the police.

Lam fell asleep in Kevin's car. When morning came, Kevin again threatened him and his family if he did not get the money. Kevin and Lam entered the bank, and Lam asked the teller to withdraw all possible cash from his credit cards and checking account. The teller's computer screen indicated "customer's possibly kidnapped" and to call 911. Bank employees stalled the transaction until police arrived. Kevin left the bank to use the restroom in a neighboring building. Lam did not tell bank staff he had been kidnapped, nor did he disclose his kidnapping to police when they arrived. He did not know if Kevin had fled, and he was still scared for his family's safety.

Kevin was arrested and was interviewed by police. That interview was recorded and played to the jury. First he said Lam had a gun. Then he said he had a gun and used it to scare Lam, and it was discharged during a struggle. He said he threw the gun into the ocean, at which point the matter was settled, the two agreed to let bygones be bygones, and Lam had no reason to fear Kevin for the duration of the road trip. Kevin said he punched Lam with a fist when he first met him at Vu's. He denied pistol whipping Lam, claiming Lam's facial gash was the result of a fall before the two met. Kevin denied demanding money from Lam, and he repeatedly claimed that Lam had offered him money to redeem himself after learning that Vu was Kevin's girlfriend. But he also said that Lam had offered him money to get him out of the picture so Lam could have a chance with Vu.

No gun was recovered from Kevin, Lam, or either vehicle. A small hole, bullet, and spent casing were found in Lam's back seat, and a tactical knife was found under Kevin's passenger seat.

3

### 2. Murder For Hire
### a. Communications between Kevin and Officer Davis

While Kevin was in custody, San Jose Police Officer Theodore Davis learned from a confidential jail informant that Kevin was soliciting Lam's murder for hire. Working undercover and using the name Richard, Davis visited Kevin in jail on March 10, 2011. They spoke through a glass barrier by phone, and that conversation was recorded. Davis told Kevin that his cousin had sent him, and he asked Kevin if he knew what he was talking about. Kevin nodded several times and winked at Davis. Davis spoke with Kevin about "dismantling a bike." He told Kevin he would need to break the bikes down and would need $4,000 per bike and tools for the job. Kevin said that would not be a problem. Davis told Kevin he would need some money up front and hardware for the job. Kevin responded, "those Indian bikes are costly." Kevin instructed Davis to send him a letter and he would "fill in" the rest. Davis pressed a Facebook photograph of Lam, with "Peter Lam" written above the image, to the glass barrier and asked Kevin if that was a bike he wanted dismantled. Kevin said yes, that he did not have a need for it anymore. Not sure how many persons Kevin wanted killed, Davis asked Kevin where the other bike was. Kevin said that bike was with him.

Davis testified that he spoke to Kevin in code because he was portraying himself as a hit man, he knew the phone conversation could be recorded, and he did not want the investigation compromised or Lam's safety jeopardized. He used "dismantle" to mean kill or murder, and "take care of it" and "fix it up" to mean kill and dispose of. "Tools" and "hardware" meant guns, and the victim was referred to as a "bike." He acknowledged that he had formed an opinion before meeting Kevin that Kevin wanted to hire him to kill Lam, that the code words were his, not Kevin's, and that Kevin never used the words murder or kill during their visit.

Per Kevin's instruction, Davis wrote Kevin a letter on March 13. He asked if Kevin was sure he wanted Davis "to get rid of the one I showed you," and said he would "need $400 up front and some tools for the job." Davis wrote, "Have your freind [*sic*] give me a call to get the tools and the mony [*sic*]. I will take care of the rest." He provided a return address and phone number. Kevin wrote that he was "getting all the information you need put together." Kevin continued: "I don't want to risk interception of everything on one letter. I will write back soon. I'm currently positioning all the assets and tools into one location. Please be patient a little, we'll work together to get things done." The postscript read: "Don't worry about writing back. They open mail here, I'll stay in contact until I ask for a confirmation. Thanks, and destroy this letter when you're done with it."

On April 28, Davis received a second letter from Kevin dated April 12. Kevin explained he was minimizing his communications to avoid interception, that an associate would be representing him, and that associate would be contacting Davis with information on the bikes needing work. The letter continued: "I'm letting you know I'm still serious, I was just having difficulties moving all my furniture and stuff and tools to stay in constant contact with you. You do not need to write back. Please contact with my associate and I'll receive word through him." The postscript read: "Also, get what you need from the letter and dispose of it with the envelop [*sic*] too."

4

**b. Communications between Cuong and Officer Davis**

On April 11, 2011, Kevin's brother Cuong, who lived in Orange County, sent Davis the first of nearly 100 text messages, saying, "Hey Richard, [¶]. . .[¶] I was asked to contact you from Kevin regarding dismantling a bike." Davis responded, "hey, let's do this. I need some money and some equipment up front." On April 13, Cuong texted Davis, asking if he had information on the bike, saying he did not know much about it. He sent a phone number and texted "hit me up" and "ask for Mike" (the name adopted and used by Cuong). Davis called that number, reached a Big-O Tires store, and spoke with Cuong. Davis recorded the call.

Cuong told Davis that Kevin had told him to contact Davis regarding a bike, but that he (Cuong) did not know much about it. Davis told Cuong he needed $400 and some "hardware for the bike, some tools." Davis asked Cuong if he knew what Davis was talking about. Cuong said he did, he could come up with the money and the equipment, and it would be easier for him to get the equipment than Davis. Davis asked when Kevin wanted it done and Cuong said "the sooner the better I would imagine," and to give him a week. Cuong told Davis not to talk with Vu, that she was Kevin's ex and might want to keep the bike. Davis told Cuong to let him know exactly what kind of tools he was going to get to help Davis figure out what he could do. Davis used the same code words with Cuong that he used with Kevin to maintain the operation's integrity and Lam's safety.

In a follow-up text the next day, Davis explained that he needed 10 percent of the money, which was $400 cash, and a gun, and that he was going to "get rid of this guy." Davis used explicit language because Cuong had claimed only a "vague notion" during their phone call about what was going on, and Davis wanted to be sure Cuong knew what Kevin wanted done. Cuong responded: "What I meant by not knowing, I do not know much info about the bike, like whereabouts." Davis responded: "[O]kay, cool, when can we meet so I can get the cash and the tool." Davis asked for the size of the tool and whether there was a way Kevin wanted it dismantled. Cuong responded that he had a ".32 ratchet" and a "762 long ass breaker bar," and he had no dismantling specifics. Davis understood those references to mean a .32 caliber handgun and a rifle. Davis asked for both, and Cuong replied: "[T]he ratchet was a sure one," and "pending on the breaker bar."

On April 19, Davis texted Cuong asking when he would be in town. Cuong responded "at least another week;" that he was trying to get money. On April 26, Davis texted Cuong asking when they could meet. Cuong responded, "[I]t's still good;" he was trying to get some money together, and thought he could come to San Jose that Sunday. Davis responded that day was not good for him and asked if the following Sunday would work. Cuong texted back "definitely, bud, we will be in touch."

Cuong texted Davis on May 11, "Hey, Richard, I was supposed to be there this Sunday. Didn't pan out." He said he would be in San Jose on May 22. On May 18 Davis confirmed by text message that Cuong would be in San Jose on the 22d. On May 20, Cuong texted that he had the tools and the cash and that a friend would deliver them that Sunday. Davis called Cuong and told him he did not want another party involved. They agreed to meet Memorial Day weekend. Cuong told Davis, "everything's ready," he would be the

5

one paying Davis, and "this is the last thing that I wanted to do, you know what I mean?" Shortly after that call, Davis texted Cuong trying to advance the meeting by one week. Over the next three days, several text messages were exchanged, and the meeting was rescheduled to early June.

Davis met Cuong at a Lowe's parking lot in San Jose on June 5. Cuong told Davis he could not get the breaker bar, but he had the ratchet and the money. Cuong retrieved a shoe box and an envelope from his trunk and gave them to Davis. They shook hands, and Davis told Cuong he would let him know when the job was done. The shoe box contained a semiautomatic hand gun with a loaded magazine. The envelope contained $400 cash and a typed letter. The letter informed Davis: "Here is all the info I have on the 'bike' [¶] - Name: Peter Lam." The letter contained Lam's physical description and personal information. It stated: "Dismantle as best you can. Trying to prevent the bike from testifying."

Another round of text messages was exchanged on June 14 in an effort to lure Cuong to San Jose to be arrested. Davis texted Cuong that he could not dismantle the bike with the ratchet because it was too close, and that he needed the breaker bar to dismantle the bike in the right way. Cuong responded "crap. My tool supplier is actually locked up. That's why it's so hard to get the breaker bar the last time." Davis texted that he would let Cuong know when it was done. Cuong texted that he was "real sorry about the tools," and Davis responded "no problem. I will handle it." Davis asked Cuong to meet him half way to show him a picture of the bike, not wanting "to get rid of the wrong shit." Cuong texted, "you don't want to text the pic, huh?" Davis texted that he was 99 percent sure it was the right bike. Cuong responded that one of the kickstands on the bike was broken, and Davis replied that he would handle it. Cuong was arrested the next day in Orange County.

**c. Communication between defendants—Kevin's letters to Cuong**

While in custody in March 2011, Kevin handwrote a series of letters to Cuong. Those letters were admitted into evidence by the prosecution with no objection from either defendant. In the first letter dated March 20, Kevin told Cuong four things: (1) "be strong through this"; (2) "believe in each and every word I say"; (3) "I'll need all of you guys to pull through this . . ."; and (4) "Number 4 will be discussed later at the end." Kevin asked Cuong to persuade the Lam family to drop the charges. He concluded the letter: "PLEASE HELP US OUT!!! I'M SCARED I'LL LOSE WITHOUT YOU GUYS!!!" (Emphasis in original.) A copy of Davis's March 13 letter to Kevin was attached, with the following written in Kevin's handwriting at the top of that letter: "THIS WILL BE OPTION #4. SIMPLE TO UNDERSTAND. THROW AWAY AFTER READING. THANKS." (Emphasis in original.)

In an April 10 letter, Kevin wrote "I just got off the phone with you when I started to write this letter." Kevin referenced Davis's letter. He provided a physical description of Lam and a detailed description of Lam's car. He identified Lam's neighborhood, high school, and junior college. He also identified as witnesses Lam's sister and a 7-Eleven clerk. Kevin wrote, "So these are the key players for Richard. [¶] I believe this was what was trying to be said during our meet."

In an April 12 letter Kevin wrote Cuong that Vu "knows the

situation" and "had been informed to confirm [a] visual of Lam," and attorney "RICHARD Wilson is hireable [*sic*] with your discretion." (Emphasis in the original.) The letter continued, "If I stand trial and no one can testify against me, basically I win. From my understanding victim doesn't have anything to say so jury can only listen to me. A private attorney can by [*sic*] time." Kevin suggested that Cuong find Lam and have a "heart to heart" with Lam's family to drop the charges. The letter concluded: "Richard is Super Spectacular as an attorney. He might be able to help. Look up online at cases and how they are won with plaintiffs and witnesses not wanting to testify . . . . Take care and keep your head up. Richard has visual confirmation with me on primary basis. He may have tracked my case's key already. Between me and him he has discovered a [F]acebook with a visual confirm. I will write to him and notify him of taking on my case as an attorney so he knows you will . . . get a hold of him."

Kevin wrote Cuong on April 23, referencing "Super Solarium" and asking Cuong to be selective on which attorney to hire because "[d]ifferent attorneys have different defense routes." Kevin concluded: "[M]y hands are tied and I pretty much have to rely on outside members to make some decisions for me."

In a May 15 letter, Kevin mentioned the advice of a jail inmate who received a good deal because of a witness's lack of credibility. Kevin wrote, "we need to find a way to discredit the victim. Make him look like a really bad person. Find a weakness, aka, 'kiddie stuff,' weapons, drugs, anything that would put him in here." Kevin explained how to locate Lam's home using the internet. The letter concluded: "If things don't look to [*sic*] favorable within the next month or two, I will take some irrational choices. I feel I really have a 20% chance of 'getting out.' I 'found a hole' in my case I might use. I have my son I want to get back too. So if options are out I will attempt my last choice. Just to let you know."

In an undated letter postmarked June 1, Kevin laid out a plan to discredit Lam. The letter opened: "So this is the plan. It's less chance of leaving a bad trail. It will be to discredit the main part of my case. The primary concern will have very nasty charges on hand. Drugs, firearm, possibly kiddie stuff. This is for leverage." The letter continued: "The first step is already done and the next will require a G to get going. This is for supply purchasing. This is where it will get complicated. Because timing is crucial we will need to have the finances ready on the fly. You will be contacted to meet but I know you are of far distances. I do not know if you can make a drive up if you are contacted. Therefore, a drop might have to be made before hand. I will have the details cleared up before I see you."

The last letter, dated June 6 (the day after Cuong delivered the money and gun to Davis) and postmarked June 9, explained that a friend will be contacting Cuong asking for a $1,300 Western Union money gram, and that Cuong will need to send another money gram for $1,000 once Lam is in custody.

**B. CUONG'S CASE**
**1. Cuong's Testimony**
Cuong is five years older than Kevin. They had a falling out over their mother's care when Kevin moved from Orange County to San Jose in 2007. Thereafter, they saw each other only twice before Kevin's kidnapping arrest—at their mother's funeral in 2009 and at

7

Thanksgiving in 2010. In January 2011, Cuong learned of Kevin's arrest and reached out to him by letter. He wrote: "When I learned of what happened to you, I cried as I drove home from work. I still can't believe all this is happening. . . . I miss you and love you very much. You will always have a place in my heart. I will visit as often as I'm allowed to. [¶] I will help out as much as I can. [¶] You will always be loved. . . . Take care, I love you brother." Cuong visited Kevin in jail in February and April. Those visits occurred by telephone through a glass barrier. The April 11 visit was recorded and admitted into evidence. Kevin called Cuong several times from jail. Cuong moved into evidence a series of recorded calls between March 19 and May 28. Cuong recalled speaking with Kevin in February, but no evidence was presented that those calls were recorded. On March 19, Kevin told Cuong he had sent Vu a letter. He also was sending Cuong a letter but that letter would trail Vu's letter. Kevin asked Cuong to read his letter carefully, that "there's basically two last hopes on this." On March 21, Kevin told Cuong he would know what was going on after he got "your end" and Vu received "the other side of it," and to call Vu and tell her it would be "an easier joint effort." Kevin said that Vu would have a better understanding of the letter and Cuong understood that Vu would have information for him. On March 27, Kevin pressed Cuong that it was important that he speak with Vu.

On April 2, Cuong told Kevin that he and Vu had received their letters. Kevin said he sent Vu more information, and he conveyed that Vu would be able to explain his letter. Cuong testified that his letter—the March 20 letter—was not clear and he did not understand what he was supposed to do with the information in that letter. He thought that Davis's March 13 letter had no relevance to his letter, and he did not know why it was included. Cuong understood his letter to be asking for him to reach out to the Lam family so Lam would drop the kidnapping case.

On April 9, Kevin asked Cuong to confirm that Vu had received a packet containing three sealed envelopes. Cuong testified that he followed up with Vu regarding the envelopes. Cuong was trying to hire a private attorney for Kevin, and he testified that his comment to Kevin that he did not need anything from him referred to anything an attorney might need. On April 10 Cuong travelled to San Jose to visit Kevin and meet Vu. Kevin asked Cuong during that visit, "Anything else you need to know?" Cuong answered "[n]o." Cuong testified that he understood Kevin's question to be referencing the March 20 letter and, although he said no, at the same time he mouthed "What" and hand gestured to Kevin to convey "What are you saying?"

That evening Cuong received a call from Kevin while he was in his motel room waiting for Vu. Kevin told Cuong that his letter to Vu was more detailed. Although Vu met Cuong with "a bundle of paperwork" and Cuong's first words to Kevin when Kevin called again that night were, "Hey, I got everything dude," Cuong testified that Kevin's letter to Vu was very apologetic, and nothing in the letter was directed at him. Cuong could not remember what Kevin meant on that call when Kevin said that he had written a letter "for both you guys to read."

Cuong testified that Vu had a copy of Davis's letter, and they initially thought it was a request to do motorcycle repair work. According to Cuong, Vu told him she had been exchanging phone

8

> calls and text messages with a man named Richard and that Kevin had asked her to drive Richard to Al's house for firearms to plant on Lam. Cuong and Vu discussed the letter and together concluded that it related to that plan. Cuong then understood "tools" to mean "firearms," and that "getting rid of the one I showed you" meant having Lam arrested. He texted Davis the next day to implement that plan.
> Kevin called Cuong the following evening asking if he needed any particular information. Cuong responded "car" because he wanted information on where to plant the firearms. Cuong testified that Kevin's comment on that call—that Vu would be able "to verify [¶] . . . [¶] [f]or visual purposes"—was a reference to Lam's car.
> **2. Vu's Testimony**
> Vu testified that in January 2011 Kevin had been her boyfriend for almost four years and they were on the verge of breaking up. She had met Lam, whom she liked, and she took that new relationship "to another level."
> On April 10, Vu and Cuong read her letter from Kevin in the motel room. She did not keep the letter, but she remembered it being apologetic. She did not remember if Cuong showed her a letter or whether they compared letters. She did not recall getting a letter from Kevin with a note from Richard (Officer Davis). She testified that Richard called her a couple of times in February. He told her that he owed Kevin a favor but he was not specific about what he wanted. After meeting with Cuong in the motel room and at Cuong's request, Vu texted Richard asking that he meet with Cuong.
> **3. Impeachment Evidence Regarding Officer Davis**
> Officer Davis's ex-girlfriend testified regarding a fight she and Davis had in 2007 driving home from a bar after a night of heavy drinking. The two were arguing and Davis restrained her from getting out of the car. Davis held her arm and head. He also twisted her arm behind her back once they were home, and she called the police. Photographs showed bruising on her cheek.

People v. Tran, No. H038262, 2016 Cal. App. Unpub. LEXIS 5799, at **1−23 (Cal. Ct. App. Aug. 5, 2016) (footnote omitted).

## DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

B.  Claims & Analysis

Petitioner seeks federal habeas relief under 28 U.S.C. § 2254 on the following claims: (1) insufficient evidence that Petitioner harbored the specific intent to kill; (2) Petitioner was denied the right to a fair trial because his case was jointly tried with the co-defendant; and (3) Petitioner's sentence constitutes cruel and unusual punishment. The claims are without merit.

   1.  Insufficient Evidence

Petitioner claims that there is insufficient evidence to sustain his conviction of conspiracy to commit murder. Specifically, he alleges the "prosecution failed to prove [Petitioner] was 'one of the participants who harbored the specific intent to kill.'" Pet. at 21 (quoting People v. Petznick, 114 Cal. App. 4th 663, 680-681 (2003)).

Federal habeas corpus relief is available to a prisoner who claims that the evidence was

insufficient to support his state conviction only where, considering the trial record in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). This standard is applied with reference to the substantive elements of the criminal offense as defined by state law. Id. at 324 n.16; Sarausad v. Porter, 479 F.3d 671, 678–79 (9th Cir. 2007).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). After all, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Parker v. Matthews, 567 U.S. 37, 43 (2012) (citation and internal quotation marks omitted).

Under 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision reflected an "unreasonable application of" Jackson to the facts of the case. Id. at 1275.

Under California law, "[a] conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense . . . ." People v. Jurado, 38 Cal. 4th 1223, 1228 (1998) (emphasis added). Thus, for conspiracy to commit murder, the participants must agree to commit that offense and possess the specific intent to kill. People v. Cortez, 18 Cal. 4th 1223, 1228 (1998). To prove a conspiracy, it is sufficient if the evidence directly or circumstantially shows "the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design." People v. Vu, 143 Cal. App. 4th 1009, 1025 (2006). Factors bearing on this issue include "the conduct, relationship, interest, and activities of the alleged conspirators before and during the alleged conspiracy." People v. Rodrigues, 8 Cal. 4th 1060, 1135 (1994).

Petitioner does not dispute that the record supplies ample evidence of the "intent to agree or conspire," conceding that he "knew he was breaking the law when he agreed to help his

11

brother." Pet. at 21. But Petitioner disputes that he possessed the specific intent to kill Peter Lam, arguing instead that his intent was to "plant evidence in an effort to discredit Lam, [thereby] helping his brother obtain a more favorable disposition of his criminal case." Id. at 22. Petitioner contends that "[t]he record contains no evidence [Petitioner] understood the phrase 'dismantling a bike' to be code for murdering Peter Lam," and therefore it is "pure speculation" that Petitioner shared his brother's intent to kill Lam." Id. at 20.

The California Court of Appeal rejected Petitioner's claim that there was insufficient evidence to support a finding that he specifically intended to kill Lam. When "[v]iewed in a light most favorable to the jury's verdict," the court found that "substantial evidence supports the jury's finding that [Petitioner] agreed with Kevin to have Officer Davis kill Lam." Tran, 2016 Cal. App. Unpub. LEXIS 5799, at *44. The court elaborated:

> Cuong's intent to kill is corroborated by his ongoing communications with Davis. After their April 13 phone call when Cuong told Davis that his knowledge about the bike was vague, Davis followed up with a blunt text: "[H]ey, you said you don't know much about this, but I need $400 cash and a gun. [¶] . . . [¶] When I get rid of this guy, I am gonna need the rest of the cash." Cuong responded: "What I mean by not knowing, I do not know much info about the bike, like whereabouts." Cuong understood the plan was for Davis to "get rid of" Lam, and he never indicated to Davis that he understood "get[ting] rid" of Lam to mean planting a firearm on him. Before contacting Davis, Cuong had received Kevin's letter incorporating Davis's letter as "Option 4," and Davis's letter also spoke about "get[ting] rid of" Lam, not planting evidence. Cuong delivered a handgun, loaded magazine, and $400 to Davis. In a follow-up text message exchange, he expressed no confusion or ignorance when Davis asked him for a rifle because he could not "dismantle" Lam at close range. The jury could have inferred from Cuong's actions that he understood "dismantle" to mean "kill."

Id. at *44–45.

The California Court of Appeal's determination that sufficient evidence supports the jury's finding that Petitioner agreed with Kevin to have Davis kill Lam was not an objectively unreasonable application of Jackson to the facts of the case. See Juan H., 408 F.3d at 1275. Viewed in a light most favorable to the prosecution, it simply cannot be said that no rational trier of fact could have found, beyond a reasonable doubt, that Petitioner possessed the specific intent to kill Peter Lam. See Jackson, 443 U.S. at 324. Petitioner is not entitled to federal habeas relief on his insufficient evidence claim. See 28 U.S.C. § 2254(d).

2. Misjoinder/Failure to Sever

Petitioner claims that he was denied his due process right to a fair trial by having a joint trial with his brother and co-conspirator, Kevin Tran. Pet. at 35. Specifically, Petitioner argues that a joint trial was grossly unfair because the jury heard "highly prejudicial" and "inflammatory" evidence of Kevin's crimes that resulted in the jury judging Petitioner "for the actions of his brother," rather than solely on evidence of his own guilt or innocence. Id. at 42–43.

A state trial court's refusal to sever charges will give rise to a federal constitutional violation only if the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). To prevail, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair, Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997), and that the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict, Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

There is a risk of undue prejudice whenever joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible. United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir. 1986). This risk is especially great when the prosecutor encourages the jury to consider two sets of charges in concert and the evidence of one crime is substantially weaker than the evidence of the other crime. Bean v. Calderon, 163 F.3d 1073, 1084–85 (9th Cir. 1998). But joinder generally does not result in prejudice sufficient to render a trial fundamentally unfair if the evidence of each crime is simple and distinct (even if the evidence is not cross admissible), and the jury is properly instructed so that it may compartmentalize the evidence. Id. at 1085–86.

Here, the trial court denied Petitioner's pretrial motion to sever his trial from Kevin's, ruling that "a substantial amount of evidence would be cross-admissible, that the evidence in both cases was substantial, that neither case was unduly inflammatory, and that there was not a substantial danger of jury confusion." Tran, 2016 Cal. App. Unpub. LEXIS 5799, at *46–47. Petitioner does not argue the trial court abused its discretion in finding joinder proper in its pretrial ruling; rather, he contends that the "actual impact of joinder at trial" was so grossly unfair that his due process rights were denied. Pet. at 35.

The California Court of Appeal rejected Petitioner's claim, determining that there was no suggestion during the trial that Petitioner "was involved in or condoned Kevin's conduct," or that Kevin's conduct during the kidnapping placed "moral culpability" on Petitioner. Tran, 2016 Cal. App. Unpub. LEXIS 5799, at *49. The court also noted that the jury was instructed to "separately consider the evidence as it applies to each defendant" and to "decide each charge for each defendant separately." Id.

The California Court of Appeal's rejection of Petitioner's claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Kevin's kidnapping of Lam took place before Petitioner learned of the kidnapping and began to conspire with Kevin (and Davis) to kill Lam. The evidence of Kevin's kidnapping of Peter Lam—which Petitioner maintains prejudiced the jury against him—therefore is "simple and distinct" from the evidence of Petitioner's conspiring with Kevin (and Davis) to kill Lam. See Calderon, 163 F.3d at 1085. Furthermore, the jury was properly instructed to separately consider the evidence as to each defendant, and jurors are presumed to follow the court's instructions. See Richardson v. Marsh, 481 U.S. 200, 206 (1987). Petitioner is not entitled to federal habeas relief on his misjoinder/failure to sever claim. See 28 U.S.C. § 2254(d); see also Runningeagle v. Ryan, 686 F.3d 758, 776–77 (9th Cir. 2012) (noting that there does not appear to be any clearly established Supreme Court precedent requiring severance of criminal trials in state court sufficient to support a habeas challenge under § 2254).

3. Cruel and Unusual Punishment

Petitioner was sentenced to 25-years-to-life for his part in a conspiracy to commit murder. He claims this sentence was a cruel and unusual punishment, violating his rights established by the Eighth Amendment. Pet. at 66–67.

The Eighth Amendment prohibits criminal sentences that are disproportionate to the severity of the crime. Solem v. Helm, 463 U.S. 277, 284 (1983) ("[The Eighth Amendment] prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed."). But the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." Ewing v. California, 538 U.S. 11, 23 (2003). A sentence will be

14

found grossly disproportionate only in "exceedingly rare" and "extreme" cases. Lockyer v Andrade, 538 US 63, 73 (2003).

Petitioner emphasizes that his participation in this crime was an "aberration" from an otherwise law-abiding life. Pet. at 68, 76. He characterizes his involvement as someone who had "lived his life as a productive and contributing member of society" until led astray by a desire to help his brother. Id. at 77. Additionally, he argues that the involvement of an undercover police officer, Davis, ensured that Peter Lam was never in actual danger. Id. at 75.

The California Court of Appeal determined that the sentence was proportionate to the gravity of the crime, noting that Petitioner is "a mature, capable adult who knowingly agreed to help his brother kill a witness" and who "provided a stolen gun to someone he thought was a hit man." Tran, 2016 Cal. App. Unpub. LEXIS 5799, at *54. It further noted that Petitioner "demonstrated sophistication and active involvement in the conspiracy," and took steps to "undermine the justice system" by "sacrific[ing] another man's life to thwart his brother's kidnapping prosecution." Id. Ultimately, the court concluded that given the nature of the crime, Petitioner's sentence was "not grossly disproportionate" under the Eighth Amendment. Id.

The California Court of Appeal's rejection of Petitioner's cruel and unusual punishment claim was not contrary to, or an unreasonable application of, the "grossly disproportionate" standard set forth by the Supreme Court. Cf. Harmelin v. Michigan, 501 U.S. 957, 996 (1991) (upholding sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine). Petitioner played a central role in the conspiracy. Kevin Tran was behind bars, and the conspiracy required Petitioner's active involvement to come to fruition. In the course of his involvement, Petitioner provided a handgun, ammunition and money to someone he believed was a hit man. His tangible actions were aimed at subverting the justice system by eliminating a key witness. Petitioner is not entitled to federal habeas relief on his cruel and unusual punishment claim. See 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. And pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because it cannot be said that "reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

**IT IS SO ORDERED**.

Dated: August 9, 2018

_____
CHARLES R. BREYER
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CUONG QUOC TRAN,<br>　　　　Plaintiff,<br>　　v.<br>JOSIE GASTELO,<br>　　　　Defendant. | Case No. 3:18-cv-00626-CRB<br><br>**CERTIFICATE OF SERVICE** |

　　I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

　　That on August 9, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Cuong Quoc Tran ID: A-L3711
P.O. Box 8101
San Luis Obispo, CA 93409-8101

Dated: August 9, 2018

　　　　　　　　　　　　　　　　　　Susan Y. Soong
　　　　　　　　　　　　　　　　　　Clerk, United States District Court

　　　　　　　　　　　　　　　　　　By:_____
　　　　　　　　　　　　　　　　　　Lashanda Scott, Deputy Clerk to the
　　　　　　　　　　　　　　　　　　Honorable CHARLES R. BREYER